UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 03- 10370-DPW |
| | ) | |
| JOSE VEZGA | ) | |

MOTION TO SUPPRESS FRUITS OF
ILLEGAL SEARCH AND SEIZURE AND STATEMENTS

Defendant, Jose Vezga, respectfully moves that this Court suppress and exclude from evidence three baggies of marijuana, one Vicodin pill, one yellow Klonopin pill, eight pink Klonopin pills, rolling papers, a small scale, and any other items allegedly observed or seized during or as a result of a warrantless search of his home on December 3, 2003, as well as any statements allegedly made by him that resulted from the unlawful search and seizure, and any and all other evidence or statements derived therefrom.

As grounds for this motion, defendant states that the physical evidence and statements were obtained in violation of his rights under the Fourth and Fifth Amendments to the United States Constitution.

Defendant further states:

1.  Agents did not have a warrant to search the defendant's home.

2.  Defendant did not consent to any search of his home.

    3.    The agents had no justification for searching the defendant's home.

    5.    Any statements allegedly made by Mr. Vezga as the result of the illegal search of his home are the direct product of the illegal search and should be suppressed.

Since the agents did not have a warrant to search the defendant's home, the government has the burden of showing that the challenged police conduct was lawful.  <u>United States v. Melendez</u>, 301 F.3d 27 (1st Cir. 2002).  Defendant reserves the right to amend or supplement this motion in response to the government's reply and to the extent that additional discovery and investigation make necessary.

I. <u>FACTS</u>[1]

At about 7:00 a.m. on December 3, 2003, Jose Vezga drove into the parking lot adjacent to his apartment building at 7 Dyer Court in Danvers, Massachusetts.  As he pulled into a parking space, a Ford SUV drove up directly behind him, blocking his car.  A DEA agent in plainclothes, Christian Brackett, quickly got out of the SUV, went directly to the driver's door of Mr. Vezga's car, displayed a police badge, and told Mr. Vezga he was under arrest.  A second DEA agent, also in plainclothes, Dennis Barton, alighted from another vehicle parked nearby and stood close by as

---

[1]The facts are taken from an affidavit of the defendant and the DEA-6 describing the arrest.

-2-

Mr. Vezga got out of the car.  Special Agent Brackett immediately handcuffed Mr. Vezga with his hands in front of him.  Affidavit of Jose Vezga, attached as exhibit A (hereinafter "exhibit A"), p. 1 ¶¶2-5.

The DEA-6 detailing the arrest, authored by Special Agent Barton, states that he gave Mr. Vezga his Miranda warnings.  DEA-6, attached as exhibit B (hereinafter "exhibit B") p. 2.  Mr. Vezga states in his affidavit that he was extremely "shocked and surprised at being arrested."  He does not remember being read his rights.  Exhibit A p. 1 ¶6.

   A. <u>Mr. Vezga's account of the search</u>

Mr. Vezga had parked his car next to the car of Kurt Walter, a co-defendant in this case.[2]  After Mr. Vezga was out of his car and handcuffed, the agents told him they were going to seize both cars.  Both cars contained a large number of items, such as car parts, tools, and clothing.  The DEA-6 states that Mr. Vezga "requested to remove his personal items from the BMW's."  Exhibit B p. 2.  Mr. Vezga remembers asking about his personal belongings, and he recalls the agents' telling him that he should remove his things from the car.  He expected to simply take some personal papers out of his car, but he realized that the agents

---

[2]Mr. Vezga is an auto mechanic and had possession of Mr. Walter's car because he was repairing it.  Exhibit A p. 1 ¶3.

expected him to remove everything, and in fact they began to help him empty the cars.  Exhibit A pp. 1-2 ¶7.

Mr. Vezga, with his hands still handcuffed in front of him, took a load of items from his car and made his way to his apartment.  The agents also took items and followed him.  Exhibit A p. 2 ¶8.  Mr. Vezga was "very shaken up, nervous, and embarrassed."  He put an item of clothing over his hands so that if any of his neighbors saw him, they would not see the handcuffs.  Id.

When he arrived at his apartment, Mr. Vezga did not believe he had a choice about letting the agents inside.  "It did not occur to [him] that they would allow [him] to go into [his] apartment alone."  Neither agent asked for permission to come in, nor did he say anything to them about allowing them in.  Exhibit A p. 2 ¶9.  He did not give the agents permission to search his apartment, and he did not want them to search it.  Exhibit A p. 2 ¶11.

Mr. Vezga states that when he and the agents arrived at his apartment, they put the things they were carrying down inside the apartment in a hallway, and then Mr. Vezga went to the kitchen to get some bags to put things in.  Agent Brackett followed him.  One did not need to go into Mr. Vezga's bedroom to get to the kitchen.  Exhibit A p. 2 ¶10.

When Mr. Vezga and the agents arrived at his apartment with the last load of items, Mr. Vezga asked to use the bathroom before leaving, and Special Agent Brackett accompanied him. While the defendant was in the bathroom, Special Agent Barton was not in Mr. Vezga's sight.  Mr. Vezga believes that it was at this time that Special Agent Barton was searching his bedroom. Exhibit A p. 2 ¶ 12.

When Mr. Vezga finished using the bathroom, Special Agent Barton emerged from Mr. Vezga's bedroom with a tray which held marijuana sticks and seeds and rolling papers.  Mr. Vezga states that "the furniture in [his] bedroom was arranged in such a way that one would have to walk completely into the room, and go around the bed, to see on top of the bureau where [Agent Barton] found" the tray.  Exhibit A p. 2 ¶¶13-14.

Special Agent Barton then began aggressively questioning Mr. Vezga about whether he had any other drugs, guns, or money in the apartment.  Exhibit A pp. 2-3 ¶14.

Mr. Vezga told Special Agent Barton that the materials on the tray were for rolling marijuana cigarettes for personal use. He said he did not have any guns or money in the apartment. Special Agent Barton asked Mr. Vezga to sign a consent form to allow the agents to search his home, but Mr. Vezga refused.  <u>Id</u>.

Special Agent Barton then told Mr. Vezga that he easily could get a search warrant to search his apartment, and that it

was futile for Mr. Vezga to refuse to allow the police to search. He made a call on his cell phone and led Mr. Vezga to believe that he was calling the prosecutor to request that she obtain a search warrant for Mr. Vezga's apartment, saying things into the phone such as, "I'm calling for a warrant." In addition, he told Mr. Vezga that it would be "much better" for him if he allowed them to search and that it would "help him." Exhibit A p. 3 ¶16.

Believing that the police were certainly going to get a search warrant, Mr. Vezga went to his closet and took out a small lunch-size cooler which had two baggies of marijuana in it. Exhibit A p. 3 ¶17.

B. <u>Special Agent Barton's account of the search</u>

In the DEA-6 Special Agent Barton states that when the agents were talking to Mr. Vezga about cleaning out the cars, Special Agent Barton told Mr. Vezga that they would need "some type of bags" to put the items in, and asked if Mr. Vezga had any bags in his apartment or in the cars. Exhibit B p. 2. According to the report, Mr. Vezga told the agents he had bags in his apartment and "allowed the agents to enter his apartment (C2) with Vezga present." <u>Id</u>. The report continues, "Upon entering the apartment, S/A Barton observed in plain view in the bedroom, marijuana and marijuana rolling papers on the bureau." <u>Id</u>.

The report states that after making two trips "to clean the BMW's out" and store the items from the cars in the apartment,

"prior to leaving the apartment for the final time," Special Agent Barton asked Mr. Vezga "about the marijuana he had seen on the bureau," and Mr. Vezga told him that the marijuana was for personal use. Finally, the report notes that "S/A Barton asked for VEZGA'S consent to search the apartment and VEZGA consented but refused to sign a consent to search form." Id.

II. THE POLICE HAD NO JUSTIFICATION FOR SEARCHING MR. VEZGA'S HOME.

A. The Law

Consensual searches are an exception to the Fourth Amendment's warrant requirement. Florida v. Jimeno, 500 U.S. 248, 251 (1991). The prosecution, however, has the burden of showing, by a preponderance of the evidence, that any alleged consent was knowing, intelligent, and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Perez-Montanez, 202 F.2d 434, 438 (1st Cir. 2000).

The standard for measuring consent is "objective reasonableness"; what would the typical reasonable person have understood by the exchange between the officer and the suspect? Florida v. Jimeno, supra; United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992). Whether consent is coerced or voluntary is a question of fact, to be determined after evaluating the totality of the circumstances. United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989). The fact-finder must look beyond the language of consent to the context of the situation, including the actions

and statements of the police.  <u>United States v. Turner</u>, 169 F.3d 84, 87 (1st Cir. 1999).  When deciding whether a suspect's consent to search was voluntary, courts have found factors such as whether the suspect was advised of his rights, or whether consent was obtained under inherently coersive circumstances to be pertinent.  <u>United States v. Forbes</u>, 181 F.3d 1, 5 (1st Cir. 1999), citing <u>United States v. Barnett</u>, 989 F.2d 546, 555 (1st Cir. 1993).

    A consensual search may not exceed the scope of the consent given, <u>United States v. Turner</u>, 169 F.3d 84, 87 (1st Cir. 1999), and the burden is on the government to prove that the search was within the scope of the consent.  <u>United States v. Schaefer</u>, 87 F.3d 562, 569 (1st Cir. 1996); <u>United States v. Cruz Jimenez</u>, 894 F.2d 16 (1st Cir. 1990).

B.  <u>Application of law to facts</u>

    In the present case, the defendant did not consent to have the agents even enter his home, much less search it.  The defendant was simply driving to his home early in the morning when his car was suddenly blocked off, and two agents arrested and handcuffed him in the parking lot outside his apartment.  Exhibit B p. 2.  The actions of the agents shocked and surprised him.  Exhibit A p. 1 ¶6.  When the agents communicated to him that he should take his personal belongings from the two cars to his apartment, exhibit A pp. 1-2 ¶7, they did not tell Mr. Vezga

that he had the right to deny the agents entry to his home.  As the agents followed him to his apartment, it did not occur to him that he could refuse to allow them inside.  Exhibit A p. 2 ¶9.  Thus, although the DEA-6 states that Mr. Vezga "allowed the agents to enter" the apartment, the facts do not support that characterization.

Even if the Court finds that by agreeing to take some of his belongings up to his apartment, Mr. Vezga tacitly consented to the agents' entering, a "typical reasonable person" would have understood that his consent was limited to allowing the agents into his apartment for the purpose of observing him while he put his things inside.  Florida v. Jimeno, supra at 252 ("a suspect may ... delimit as he chooses the scope of the search to which he consents").  As the defendant states in his affidavit, contrary to Special Agent Barton's report that he saw the marijuana and rolling papers "in plain view" when he entered the apartment for the first time, the agents had already accompanied Mr. Vezga in and out of the apartment several times as they removed items from the cars before Agent Barton decided to look around.[3]  Exhibit A p. 2 ¶¶10-14.  Further, the tray on which the items rested was

---

[3] The search of the defendant's home cannot be justified under the "protective sweep" doctrine, as the agents had no reasonable suspicion that there were intruders or dangerous persons inside the defendant's apartment.  See Maryland v. Buie, 494 U.S. 325 (1990) (protective sweep must be supported by reasonable, articulable suspicion that area to be swept harbors dangerous person).

not in "plain view," as it was in Mr. Vezga's bedroom, on a bureau that one would have to walk all the way into the room and around the bed to see the top of.

In United States v. Turner, supra, the Court found that where the defendant expressly consented to a search of his home for evidence of a recent break-in of another home, the ensuing search of his computer was beyond the scope of his consent, and evidence found as a result of that search was properly suppressed. Turner, 169 F.3d at 89. The Court in Turner approvingly cited United States v. Dichiarinte, 445 F.2d 126, 129 (7th Cir. 1971), where police officers "who sought consent to search the defendant's premises" for "narcotics" evidence exceeded the scope of the consent by inspecting the defendant's personal papers. Turner, 169 F.3d at 87. Similarly, here, where the agents were permitted to enter, if at all, only for the purpose of observing Mr. Vezga as he put his things in the apartment, the search of his bedroom was beyond the scope of his consent.

Many cases in which the voluntariness or scope of the defendant's consent is at issue discuss the reasonable interpretation of verbal communication between police and suspects. See, e.g., United States v. Melendez, supra, 301 F.3d at 32 (mother expressly consents to general search by giving officers permission to "look around"); United States v. Pena, 143

F.3d 1363, 1368 (10th Cir. 1998) (officer's request to "look in" room encompasses search of room); <u>United States v. Rich</u>, 992 F.2d 502, 506 (5th Cir. 1993) (request to "look in" or "look through" indicates desire to search).  Here, the agents never asked Mr. Vezga if he consented to their coming into his apartment, nor, once inside, did they ask permission to search.  Mr. Vezga was under arrest; handcuffed; "shaken up and surprised"; and outnumbered.  He assumed that he could not refuse to allow the agents to enter his home and he did not want them to search it once inside.  See <u>United States v. Worley</u>, 193 F.3d 380, 386-387 (6th Cir. 1999) (knowledge of right to refuse one factor to be taken into consideration when assessing voluntariness of consent).  He cannot be said to have consented to Special Agent Barton's search of his bedroom by failing to object: he was using the bathroom while the agent was snooping around.  See <u>Turner</u>, <u>supra</u>, 169 F. 3d at 88 (where defendant downstairs with one policeman while another policeman illegally searching upstairs, defendant cannot be said to have expanded scope of search by failing to object).  When the agents finally did ask him to consent to a search, offering him a written form, he refused to sign it.

    The government bears the burden of showing that Mr. Vezga's consent was freely and voluntarily given and not the result of duress or coercion, either express or implied, and the government

cannot meet their burden by showing "mere acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968); United States v. Perez-Montanez, supra, 202 F.3d at 438.  "Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making."  United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)(internal citations and quotations omitted).  The government cannot meet their burden here: the agents had Mr. Vezga in their control, did not ask him to consent, but instead counted on his being too overwhelmed and intimidated by the situation to collect his thoughts and assert his rights.

    The two baggies of marijuana, which the defendant handed the officers as a result of the "consensual" search of his closet, must also be suppressed, as they are the direct, unattenuated product of the unconstitutional search.  If Agent Barton had not improperly searched the defendant's bedroom and found the initial marijuana and wrapping papers, he would not have been able to pressure the defendant into consenting to the search of his closet.  Wong Sun v. United States, 371 U.S. 471, 487 (1963).

REQUEST FOR EVIDENTIARY HEARING

_____Defendant respectfully requests an evidentiary hearing on this motion.

                                        JOSE VEZGA
                                        By his attorney,

                                        /s/Page Kelley
                                        Page Kelley
                                              B.B.O. no. 548237
                                        Federal Defender Office
                                        408 Atlantic Avenue, 3rd Floor
                                        Boston, MA  02110
                                        Tel: 617-223-8061

Date: November 23, 2004