```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA     )
                             )      No. 03-10370-DPW
     v.                      )
                             )
3. JOSE VEZGA,               )
                             )
          Defendant.         )
```

## GOVERNMENT'S OPPOSITION TO JOSE VEZGA'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorney Rachel E. Hershfang, hereby opposes Jose Vezga's motion to suppress evidence seized during a consent search of his apartment and statements he made to arresting agents. Claiming he did not consent to the search, and that any statements he made were the fruits of such search, Jose Vezga ("Vezga") asks this court to suppress that search and those statements.

As set forth below, this motion must be rejected. Vezga was under arrest when he voluntarily, and at his insistence, re-entered his apartment. The agents therefore had an absolute right to go into his apartment with him. Once inside the apartment, the agents were entitled to stay near Vezga and to cast their eyes around to ensure that no danger was lurking inside an open door or around a corner. In escorting Vezga into his apartment and keeping their eyes open, agents were authorized to seize any contraband in plain view. This they did. After

1

that seizure, they asked Vezga for his consent to search the apartment for additional contraband. Initially, that consent was denied; however, after Vezga realized that agents were planning to seek a warrant, he agreed to the search and led agents to additional drugs, all of which were properly seized under Vezga's consent.

I.  **Facts.**

Early in the morning of December 3, 2003, agents with the Drug Enforcement Administration ("DEA") set up outside Jose Vezga's apartment. The DEA agents, Dennis Barton and Christian Brackett, were there to arrest Vezga, who had been charged with marijuana trafficking. At about 7:00 a.m., Vezga drove into the parking lot. DEA Report entitled "Arrest of Jose VEZGA on 12-03-2003. Acquisition of Exhibits 27, 29, 30, 31, N-298, N299 & N-309" (hereinafter "Arrest Rep.") ¶3 (attached as Exhibit B to Defendant's Motion to Suppress ("Def. Mot.")). Vezga was arrested and read his <u>Miranda</u> warnings by Agent Barton. Arrest Rep. ¶4. The agents told Vezga that they planned to seize both his BMW (which had been used by codefendant Kurt Walter to effect his drug business) and Kurt Walter's BMW, which was also in the parking lot. Arrest Rep. ¶4. Vezga asked that he be allowed to take his things out of the cars before they were seized, and the agents agreed. <u>Id</u>. The items were too numerous to be hand-carried from the cars, so Agent Barton asked Vezga whether he had

bags to put the things in, either in the cars or in his apartment.  Id.  Vezga answered that he had garbage bags in his apartment, and went into the apartment with the agents.  Id.

When Agent Barton walked into the apartment with Vezga, he saw contraband (marijuana and rolling papers) on a bureau in the bedroom.  Arrest Rep. ¶5.  Agents Barton and Brackett, along with Vezga, then made additional trips to bring things from the cars into Vezga's apartment.  Arrest Rep. ¶6.  While they were in the apartment for the last time, Agent Barton asked Vezga about the marijuana he had seen earlier on the bureau.  Vezga admitted that it was marijuana, which he said he used, and gave his oral assent for Agent Barton to search the apartment.  Id.  Despite giving oral consent, Vezga refused to sign a consent to search form.  Id.  Vezga then, himself, went to the closet in the bedroom and returned with bags of controlled substances, including marijuana and pills.  Arrest Rep. ¶7.  Those items were seized, as were the two BMWs.  Arrest Rep. ¶8.

**II. Argument: The Entry Into Vezga's Apartment Was Lawful; Once There, Agents were Entitled to Seize Contraband in Plain View, to Tell Vezga About it and to Seek (and Receive) His Consent to Search.**

Vezga was under arrest when agents announced their intention to seize two BMW cars under his control (one his, one the property of codefendant Kurt Walter).  He had received his Miranda warnings, Arrest Rep. ¶4, though he claims now not to recall whether or not his rights were read to him.  See Affidavit

of Jose Vezga ("Vezga Aff."), Def. Mot. Exhibit A, ¶6.  Vezga asked for an opportunity to empty out the cars; the DEA agents agreed to accommodate his request.  When asked whether there were bags available, either in the cars or in his apartment, Vezga led the DEA agents into his apartment.  The agents were lawfully in the apartment, whether considered under the rubric of <u>Washington v. Chrisman</u>, 455 U.S. 1 (1982) (arresting officer is entitled to accompany arrested individual wherever that person goes) or whether considered a consent search, <u>see</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  Being lawfully present, Agent Barton saw, in plain view, what he recognized as contraband -- marijuana and rolling papers.  Seizure of these items was therefore lawful.  <u>See</u> <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 465 (1971).  Being present inside Vezga's apartment, agents had the right to conduct a "protective sweep" by looking quickly through the rooms to ensure no danger lurked there.  <u>See, e.g.</u>, <u>United States v. Paradis</u>, 351 F.3d 21 (1st Cir. 2003).  Whether Agent Barton saw the marijuana and rolling papers from his vantage point in the hallway or when he poked his head into the doorway of a room he passed, to make sure there were no occupants or other dangers therein, he lawfully saw the contraband.  Having seen it, Agent Barton was under no obligation to tell Vezga about it immediately.  Instead, he chose to wait until after the items had been removed from the cars.  At that point, faced with the

evidence and the likelihood of a search warrant's issuing, Vezga gave his knowing and voluntary consent to search, and provided Agent Barton with the additional marijuana.

> **A.   Agents Lawfully Accompanied Vezga Into His Apartment; He was Under Arrest and Led Them In. Once There, The Seizure of Marijuana in Plain View was Justified, Even if Seen During a Protective Sweep.**

Once the agents placed Vezga under arrest, they had the right to accompany him wherever he went. <u>Washington v. Chrisman</u>, 455 U.S. 1 (1982); <u>see also</u> <u>United States v. Ford</u>, 22 F.3d 374, 380-81 (1st Cir. 1994) (affirming search pursuant to warrant on the same basis affirmed in district court [inevitable discovery], but noting that "protective sweep" by officers accompanying defendant in custody into his house was justifiable under <u>Chrisman</u>, given that officers cited concern for their safety in going into arrestee's home); <u>United States v. DeBuse</u>, 289 F.3d 1072, 1074-76 (8th Cir. 2002)(defendant who, after arrest, requested permission to go back into house, was properly accompanied by officers; when those officers saw rifle in plain view, subsequent search of house supported by probable cause).

The Supreme Court's <u>Chrisman</u> decision is directly on point. In that case, a campus police officer saw a man who appeared to the officer to be under 21 carrying a bottle of gin. The officer approached the man, Carl Overdahl, and asked him for identification. Overdahl indicated that he would have to get his

identification from his room. The officer, who had not yet handcuffed Overdahl, nor read him his Miranda rights, indicated that he would have to accompany Overdahl to his room, and Overdahl assented. Chrisman, 455 U.S. at 3. At the dorm room, the officer stood at the threshold while Overdahl and his roommate, Chrisman, were in the room. The officer saw seeds and a pipe lying on a desk and recognized them as, respectively, marijuana and a bong. Id. at 3-4. Closer inspection, both visual and olfactory, confirmed the officer's initial impression. Id. at 4. At that point, the officer read both Overdahl and Chrisman their Miranda rights, which they agreed to waive. Chrisman then handed over a box containing more marijuana and $112. Id. The students were then told that the room would be searched, and that they had a right to insist that the officers first get a warrant. Id. After conferring, the students consented, both orally and in writing, to a search. Id. The subsequent consent search yielded additional drugs (more marijuana, as well as LSD).

Chrisman's pretrial motion to suppress the evidence was denied and he was convicted. The convictions were affirmed by the Washington Court of Appeals, but reversed by that state's Supreme Court. Id. at 4-5. The U.S. Supreme Court was presented with the question "whether a police officer may, consistent with the Fourth Amendment, accompany an arrested person into his

residence and seize contraband discovered there in plain view."
Id. at 3.

The Supreme Court reversed the Washington Supreme Court's ruling under the "plain view" exception to the Fourth Amendment's warrant requirement. "Here," the Court reasoned, "the officer had placed Overdahl under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification. The officer had a right to remain literally at Overdahl's elbow at all times; nothing in the Fourth Amendment is to the contrary." Id. at 6. The Supreme Court squarely rejected arguments that the officer had to show exigent circumstances to justify accompanying Overdahl back to his room:

> The absence of an affirmative indication that an arrested person might have a weapon available or might attempt to escape does not diminish the arresting officer's authority to maintain custody over the arrested person. [citations omitted] Nor is that authority altered by the nature of the offense for which the arrest was made. Every arrest must be presumed to present a risk of danger to the arresting officer. [citation omitted] There is no way for an officer to predict reliably how a particular subject will react to arrest or the degree of the potential danger. Moreover, the possibility that an arrested person will attempt to escape if not properly supervised is obvious.

Id. at 6-7. The Court then held that "it is not 'unreasonable' under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. [. . .] Such surveillance is not an impermissible invasion of the privacy or

personal liberty of an individual who has been arrested." Id. at 7.

Having determined that the officer was lawfully present in, or at the threshold of, the students' room (the record was in conflict as to where the officer stood initially), the Court went on to determine that he had "the right to act as soon as he observed the seeds and pipe." Id. at 9. The officer's seizure of the seeds and bong were deemed proper, and that evidence's admission at trial affirmed; similarly, the Court concluded, the additional marijuana produced by the defendant after the officer indicated his intention to get a search warrant was properly admitted. Id. at 9-10.

The facts here are strikingly similar. Vezga was arrested outside his home; as he admits, he was handcuffed before returning to his apartment. See Vezga Aff. ¶4. At his request, the defendant was allowed to return to his apartment. Arrest Rep. ¶4; see Vezga Aff. ¶8. He was accompanied by the agents, whose company he did not oppose. Vezga Aff. ¶9.

Once inside in the hallway, Agent Barton (whom the Court will note is significantly taller than Vezga) looked into a bedroom and saw marijuana and paraphernalia on the dresser. Arrest Rep. ¶5. This glance does not rise to the level of a "protective sweep," though, once inside the apartment, the agents would have been justified in doing a such a sweep of the

location.  As the Chrisman Court recognized, "[e]very arrest must be presumed to present a risk of danger to the arresting officer."  Chrisman, 455 U.S. at 7.  The "protective sweep" doctrine of Maryland v. Buie addresses this concern in the context of an arrest inside a home or building.  See 494 U.S. 325 (1990).  Recognizing that "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf,'" and that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surrounding," id. at 222,  the Buie court defined the contours of a permissible protective sweep.  Specifically, the Court held two things: first, that "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  Id. at 334.  "Beyond that, however," the court went on, "we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors and individual posing a danger to those on the arrest scene."  Id.

    Although Buie addressed the potential dangers associated with the arrest of a suspect inside his home, its rationale is equally applicable to the entry of a suspect's home immediately

9

following his arrest.  See, e.g., United States v. Cavelly, 318 F.3d 987, 994-96 (10th Cir,. 2003);  Sharrar v. Felsing, 128 F.3d 810, 822-24 (3d Cir. 1997);  United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C.Cir. 1995); United States v. Kimmons, 965 F.2d 1001, 1009-10 (11th Cir. 1992), cert. denied, 506 U.S. 1086 (1993), cert. granted and judgment vacated on other grounds, Small v. United States, 508 U.S. 902, 113 S.Ct. 2326, 124 L.Ed.2d 239 (1993), judgment reinstated, United States v. Kimmons, 1 F.3d 1144 (11th Cir. 1993); United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990); United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir. 1990), cert. denied, 502 U.S. 986, 112 S.Ct. 596, 116 L.Ed.2d 619 (1991).  In the case of such a post-arrest entry and protective sweep, the cases cited require that the search be analyzed under the second prong of Buie: that is, to support the sweep, the government must put forward "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  Buie, 494 U.S. at 334.

These cases address the entry of officers, alone, into defendants' homes following their arrests outside.  Vezga's situation is different.  This is not a case in which the agents, having arrested Vezga outside his apartment, then entered the

apartment intending to sweep it. In this case, it was Vezga, and not the agents, who insisted on re-entering his apartment after his arrest. Under the circumstances, the agents were not required to let Vezga go in alone, see Chrisman, supra, and were therefore lawfully present within his apartment. Being lawfully present in the apartment, their situation was more akin to that of an officer lawfully in a home to arrest someone than to an officer entering a home to conduct a search while the suspect was safely locked up outside. The proper analysis is therefore under Buie's first prong, which allows for agents, "as a precautionary matter and without probable cause or reasonable suspicion, [to] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334. The rationale for such a search -- the officers may be in the range of danger, and must be allowed to determine if that is so -- is equally applicable to this case, where they were being led into an apartment with which they were unfamiliar, by a person they had every reason to mistrust, at his insistence.[1]

---

[1] Even if considered under Buie's more stringent second test, the protective sweep was lawful. It occurred during the agents' first pass through the apartment, contrary to what Vezga assumes; the scope was permissibly narrow (indeed, the search was so unobtrusive that Vezga did not notice it), and it was supported by articulable facts. Specifically, the agents would testify that they were arresting Vezga for a felony drug charge; that they had no assurances as to who else was in the apartment; that Vezga's insistence on cleaning out the cars and bringing the

Having seen the contraband on his first time into the apartment, Agent Barton waited until after the cars were cleaned out before confronting Vezga with the evidence. Arrest Rep. ¶6. Vezga, like Chrisman in his dorm room, was aware that he could withhold consent to search the apartment -- according to Vezga, he initially did so. Vezga Aff. ¶12. Then, however, faced with what he believed was a probability that a warrant would issue, Vezga gave consent to search. Vezga Aff. ¶17.

The <u>Chrisman</u> analysis is dispositive here. The facts of the case squarely match with even Vezga's account of the facts. There was no Fourth Amendment violation, and the suppression motion should be denied without need for an evidentiary hearing.

**B.   The Entry into Vezga's Apartment Was Also a Valid Consent Search; the Consent Search That Followed The Plain-View Seizure Was Lawful.**

Should the Court not find the <u>Chrisman</u> analysis dispositive, the collective entry into Vezga's apartment can also be considered a consent search. Vezga, not the agents, initiated the re-entry into his apartment. As noted above, he was in custody at the time -- whither he went, so the agents would go. Even Vezga does not dispute that he made no effort to halt the

---

items upstairs made them anxious; and that, being in an unfamiliar place with an unfamiliar person, based on their experience as law enforcement officers, they were unwilling to walk past open doors without looking into the rooms to ensure they were not occupied.

agents at his threshold, cf. Vezga Aff. ¶9, and they all entered the apartment together.[2] Both this entry of the apartment and the later search of the apartment were properly conducted with Vezga's consent.

Consent searches are among the most well-recognized exception to the Fourth Amendment warrant requirement. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). In such cases, the government must demonstrate by a preponderance of the evidence that consent to search was obtained voluntarily. See United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996). Voluntariness can either be express or implied; however, it is not necessary that a suspect know or be specifically advised that he has the right to refuse. Schneckloth, 412 U.S. at 235-246 (voluntary consent constitutes waiver of Fourth Amendment rights and may be given unintentionally and without knowledge of right to refuse). See also United States v. Forbes, 181 F.3d 1, 5-6 (1st Cir. 1999)(consent voluntary despite absence of advice

---

[2] If Vezga's consent had been required, which the government maintains it was not, this failure to object would be fatal. See, e.g., United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996) (when defendant who consented to search of car was present during the search, she "could (and should) have protested at the time if she believed [the officer] exceeded the scope of her consent, as it was her consent to limit that scope"; in absence of objection, fruits of search not suppressed); United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996) (defendant's failure to object when police officers looked underneath carpet in trunk of car evidence that such search did not exceed scope of his consent to search).

regarding right to refuse).

Voluntariness determinations must be based on an assessment of all relevant circumstances. As the First Circuit recognized in United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993), cert. denied, 510 U.S. 850:

> Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent. More general considerations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.

Accord, United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000), cert. granted in part, judgment vacated in part on other grounds (Apprendi violation), 121 S.Ct. 1996, 149 L.Ed.2d 1000, 69 USLW 3738 (U.S. May 21, 2001); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999)(same). When the consenting defendant is in custody, "sensitivity to the heightened possibility of coercion is appropriate," but "'custody alone has never been enough in itself to demonstrate ... coerced... consent to search.'" Barnett, 989 F.2d at 555 (quoting United States v. Watson, 423 U.S. 411, 424 (1976)).

Vezga's argument that his consent was not voluntarily given rests on the following factors: he was "under arrest; handcuffed; 'shaken up and surprised'; and outnumbered. He assumed that he could not refuse to allow the agents to enter his home and he did not want them to search it once inside." Def. Motion at 11.

Vezga further claims that Agent Barton's initial viewing of the marijuana, which Agent Barton saw on his first entry into the apartment, must have taken place on the final trip into the apartment, while Vezga was using the bathroom, and that therefore Vezga's failure to object to that "search" cannot be held against him.  Def. Mot. at 11.  Vezga's claims are belied, in many cases, by his own admissions in the affidavits; furthermore, the government submits, his self-serving report of the facts will not prove credible if tested.

   Instead, the totality of the circumstances shows that Vezga's consent to both the entry and the subsequent search, while no doubt unenthusiastic, was voluntarily given.  There is no contention here that Vezga was under arrest, but that fact, alone, does not render his consent invalid.  See Barnett, 989 F.2d at 555 .  Under the circumstances of this case, though Vezga claims to have been both "shaken up and surprised," and "outnumbered" his own affidavit reveals a cordial encounter with two seasoned law-enforcement agents.  According to Vezga, he was approached initially by only one agent, who displayed his badge. Vezga Aff. ¶4.  Vezga was arrested without incident and then a second agent walked up.  Id. ¶¶4-5.  There is no claim that the agents' attitudes were overly intimidating, nor is there any claim that the officers displayed their weapons or otherwise frightened Vezga.  Instead, as Vezga reports, the three had a

conversation about the imminent seizure of two cars, and Vezga began, with the officers' assistance, to remove his personal items from the cars. Id. ¶7. "They were very helpful," Vezga says of the agents. Id. Although Vezga may well have been surprised by his arrest, both his own version and the agents' reveal that he responded in a practical and self-interested way to the circumstances, devising a plan to protect his possessions in the cars and carrying out the plan with the agents' assistance.

Three times, according to Vezga,[3] the agents accompanied him to his apartment, carrying things from the two cars. At no point did he tell them not to enter or ask them to leave. On the final trip, Vezga apparently sought permission to use the bathroom, and was allowed to do so. Vezga Aff. ¶12. All of these details point to a non-threatening, cooperative, unremarkable interaction between Vezga and the agents. Although the agents did not tell Vezga that he had a right to refuse them entry into the apartment (because, as described in subsection A, he had no such right), that has no bearing on the voluntariness of his consent to their being there. See Schneckloth, 412 U.S. at 235-246; Forbes, 181

---

[3] Vezga's account on this score may differ from that of Agent Barton, who described "two (2) trips to clean the BMW's out and store[] the items in the apartment." Arrest Rep. ¶6. It may also be that Agent Barton was describing two trips after the initial trip into the apartment, which he had already described. Arrest Rep. ¶¶4-5.

F.3d at 5-6.

At the end of that final trip to the apartment, Vezga and Agent Barton agree, Agent Barton confronted Vezga with the marijuana he had seen on the bedroom dresser. Arrest Rep. ¶6; Vezga Aff. ¶14. Vezga admits that he "pointed out to [Agent Barton] that there were sticks and seeds on the tray and rolling papers, for rolling marijuana cigarettes for personal use." Id. At that point, according to Vezga, Agent Barton asked "in an aggressive way" whether there were guns, cash, or additional drugs in the apartment, id., and, when Vezga refused consent to search, told Vezga that he was going to get a warrant. Id. ¶16. Vezga admits that, after allegedly hearing Agent Barton make a telephone call, "I thought that it was pointless not to allow them to search, as they would only get a warrant, anyway," so he brought out the bags of marijuana. Id. ¶¶16-17. Cf. Chrisman, 455 U.S. at 9 (consent search of defendant's room upheld where defendant produced bags of marijuana after having been advised of Miranda rights and told that he could refuse consent and insist that agents get a warrant).

Vezga's statements reveal a person making a series of sensible, thoughtful, self-interested decisions. Finding himself under arrest, Vezga immediately turned to the question of how to keep his items within the two cars from being seized. With the help of two agents, he brought his personal property into his

17

apartment. The agents were "helpful" and Vezga did not seek to keep them out of his home. When that entry worked to Vezga's disadvantage because he had left marijuana in a visible location, he prudently admitted to it, emphasizing that the small quantity of the drug and the paraphernalia pointed to personal use, rather than sale. Then, faced with what <u>he</u> thought was the likelihood that agents would succeed in procuring a search warrant, Vezga cut to the chase and brought out additional marijuana, which he gave to Agent Barton. Contrary to his argument that he was overwhelmed by the circumstances, by the number of agents, and by agent intimidation, Vezga made intelligent, thoughtful, and ultimately self-preserving choices. Rather than (temporarily) lose his property, he brought it into the apartment. Rather than fruitlessly deny the marijuana's presence, he minimized its importance. Rather than subject his apartment to a search, he brought out the contraband hidden there. In short, Vezga voluntarily consented to the search and seizure of the marijuana from his bedroom closet.

### III. Conclusion.

For the reasons set forth above, the motion to suppress should be denied without a hearing. In the event that the Court orders a hearing, the government reserves the right to rely on this brief and on any facts and arguments adduced at hearing in support of the conclusion that the motion to suppress must be

denied.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

                              By:  /s/ Rachel E. Hershfang
                                        RACHEL E. HERSHFANG
                                        Assistant U.S. Attorney

Dated: December 19, 2004